**REDACTED**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK SANDBERGEN, <br><br> Plaintiff, <br><br> v. <br><br> ACE AMERICAN INSURANCE CO., et al., <br><br> Defendants. | Case No.  18-cv-04567-SK <br><br> **ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION; AND MOTIONS TO SEAL** <br><br> Regarding Docket Nos. 71, 72, 76, 77, 80, 88, 92 |

This matter comes before the Court upon consideration of the motion for summary judgment filed by Defendants Ace American Insurance Company and Federal Insurance Company (collectively referred to as "Chubb").  Having carefully considered the parties' papers, relevant legal authority, the record in the case, and having had the benefit of oral argument, the Court hereby GRANTS Chubb's motion as to the federal claim and DISMISSES the remaining state-law claims for the reasons set forth below.  Because the Court grants summary judgment on the federal claim and dismisses the state-law claims, the Court DENIES the motion by Plaintiff Mark Sandbergen ("Plaintiff") for conditional certification as MOOT.  The Court GRANTS IN PART and DENIES IN PART the parties' motions to seal as set forth below.

## BACKGROUND[1]

Plaintiff was employed by Chubb from 2013 to 2016 as a Senior Underwriter in Chubb's Commercial P&C Insurance ("Commercial") segment based out of Chubb's San Francisco office.

---

[1] The evidence submitted by the parties supports the facts described below.

(Dkt. No. 88-8 (Declaration of Mark Sandbergen), ¶ 2.)  Plaintiff worked in the technology industry group within Commercial.  (*Id.*)  Plaintiff's base salary was $118,000 when he started, and he received raises every year.  He also received annual bonuses of over $20,000.  (Dkt. No. 100 (Deposition of Mark Sandbergen) at 235:9-236:22.)  Defendant ACE American Insurance Company's parent company, ACE Limited, acquired Federal's parent company, Chubb Corporation, in January 2016.  (Dkt. No. 28-1 (Declaration of Denise Carson) ¶ 11.)  Plaintiff resigned after the merger, in May 2016.  (*Id.*, ¶ 15.)

A.     **Plaintiff's Tasks and Goals.**

As a technology underwriter, Plaintiff focused on processing new and renewing existing commercial insurance policies for technology companies, Chubb's customers.  (Dkt. No. 100 at 27:4-20; Dkt. No. 88-8, ¶ 3.)  Despite the goals listed in his performance review and the percentages assigned to those goals, Plaintiff states that his most important task was to process new and renew existing policies.  (Dkt. No. 88-8, ¶ 6 ("an underwriters performance was measured largely by the number and value of new policies and policy renewals that he or she processed each month.")  Sybil Baffoe, Plaintiff's supervisor, developed an annual business plan and divided the goals to reach that plan, in terms of the monetary value of the new and renewal policies among the underwriters in her group, including Plaintiff.  (Dkt. No. 110-1, Ex. A (Deposition of Sybil Baffoe) at 103:14-105:10.)  According to Plaintiff, underwriting profitable policies was the most important goal for his evaluation.  (Dkt. No. 88-8, ¶ 6.)  The goal for Plaintiff, in terms of underwriting new policies, was $1.4 million in premiums.  (Dkt. No. 89-1, Ex. 1 (Deposition of Mark Sandbergen) at 225:12-226:4, 227:3-7.)

With respect to Plaintiff's role as a "clean-tech champion," he did not establish Chubb's strategy or policy on clean technology.  (Dkt. No. 110-1, Ex. A at 52:24-53:7, 54:4-14.)  Instead, Plaintiff's role as clean tech champion included keeping his colleagues in his team up to date on Chubb's strategies in that area.  (*Id.* at 54:15-19.)  He was also responsible for looking at the clean technology segment and encouraging other underwriters to pursue clean technology lines of business.  He was tasked with acquiring knowledge of the opportunities for new customers in clean technology and with sharing those opportunities with his colleagues.  (Dkt. No. 110-1, Ex. A

2

at 54:15-56:11.)

**B.      Plaintiff's 2015 Performance Review.**

Plaintiff's performance was evaluated based on eight goals, each of which were weighted differently.  (Dkt. No. 76-8 (Declaration of Susannah K. Howard), Ex. J (Plaintiff's 2015 Performance Review).)  "Book Management" was weighted the highest at 30 percent, and "Sales and Marketing" was weighted the second highest at 20 percent.  (*Id*.)  The rest were weighted between six and ten percent.  (*Id*.)

**1.      "Book Management" (30%).**

Competency for this goal was described as "[a]chieve new business, rate and retention targets for assigned book of business to support the achievement of Branch/CCI revenue and profit goals."  (*Id*.)  The metrics for this goal were described as:

> 1) Achieved targeted new business production goal of $1,400,000 of which 10% is non domestic.
>
> 2) Managed in force policy retention to targeted plan or managed lost business to targeted plan - 87% or lost business premium below $1,000,000.
>
> 3) Achieved targeted rate goal of 0%
>
> 4) Designed and implemented targeted portfolio analysis, profit and retention strategies - less than 85% combined; retention of 87%.
>
> 5) Managed to a profitable mix of business.
>
> 6) Supported customer group targeted growth goal and targeted profit goal of Combined Ratio 4% growth, and [*sic*] L/R less than 85% combined.
>
> 7) Collaborated with Underwriting Centers, UAs, and other Internal Customers regarding book management strategy and maintenance of one voice with producers.
>
> 8) Monitored/reported on status of open claims for assigned accounts or in area of specialty and made recommendations.
>
> 9) Well prepared for account reviews with management, executive underwriter and product management including demonstrated knowledge of risk, industry, competitive environment and Chubb's products and capabilities.

(*Id*.)

United States District Court
Northern District of California

**2.      Sales and Marketing (20%).**

This category was described as:

> Design/implement an effective business development strategy to prospect for new business across CCI product lines and customer segments. Includes Collaboration with Key Internal stakeholders to maximize sales and marketing efforts.

(*Id.*)  The metrics for this goal were:

> Per Branch Business Plan, achieve 5 Sales/Metric Categories: Financials - Achieved Non-Domestic new business target of $140,000 - Achieved targeted increases of Non-Domestic Submissions and Underlyer. [*sic*] Achieved targeted increase of Non-Domestic inforce count. Marketplace Visibility -- Independently builds agency visitation plan and executes against plan - Agency plans/goals developed, communicated and monitored (on monthly basis) to ensure internal attentions and adjustment. Prospecting/Account Rounding -- Recommends account rounding and cross selling strategies - Identified targeted goal of quality prospects. Generated targeted goal in new business from account rounding and cross - selling opportunities within and with other SBUs.      Market Intelligence - Effectively populated and used the appropriate sales and pipeline development tools to generate revenue and leads (salesforce.com - cornerstone management). Salesforce.com goal. Achieved targeted Cornerstone results as compared to Territory results for all other agents using 20% of submissions quoted; 60% written to quoted - Well prepared for producer meetings including demonstrated knowledge of producer performance and capability along with preparation of agenda to drive mutually beneficial /productive planning discussion. - Demonstrates awareness of how internal and competitor strategies and tactics work in our business marketplace - Reprioritizes to ensure Chubb in positioned to capitalize on market shifts - Demonstrates ability to leverage Chubb Difference.* Utilizes the HPM Blueprint to produce CCI targeted High Profit Margin Growth goal of x%.

> 1) Non-domestic new business 10% of ($1,400,000)

> 2) New Business from prospects 35%

> 3) New Business from account rounding & cross selling 60%

> 4) % quoted to submitted 30%

> 5) % written to quoted 50%

> 6) % written to submitted 15%

(*Id.*)

**3.      Key Initiatives (10%).**

This category was described as:

4

> Develop Business Plan that addresses at least one unique and innovative initiative that influences success for through [*sic*] active engagement with internal and external business partners. (Examples Collaborate with Underwriting Centers, Educate internal or external business partners, Engage with internal business partners on key accounts with creative project, Mentor and coach colleagues, Partner with branch manager /marketing manager /home office on initiatives, Engage with Service Departments to leverage our competitive advantages, Champion initiative to maximize territory opportunities, Become go-to person for niche). *Membership and participation in external trade groups e.g. Bio, FGC, Clean Tech etc. *Branch champion for Regional or National initiatives like Clean Tech, HIT, MRG etc. *Utilize the HPM Blueprint to drive CCI targeted High Profit Marge business for your branch(es)

(*Id*.) The metrics for this goal were:

> 1) Clean Tech Champion
>
> 2) Endeaver [*sic*] to become more familar [*sic*] with FGC new business opportunies [*sic*]

(*Id*.)

**4.    Producer and Key Account Management (10%).**

This category was described as:

> Manage producer and key account relationships for assigned territory through proactive communications, visitation, and collaboration with key internal stakeholders to retain and grow the business.

(*Id*.) The metrics for this goal were:

> 1) Reviewed and addressed agency results externally (written premium, growth, book characteristics) vs plan on quarterly basis to ensure external communication, attention, and producer accountability.
>
> 2) Conducted targeted minimum of agency visits/conference calls per month (50 visits during second half of the year);targeted number of visits with key Cornerstone agents per month.
>
> 3) Identified and addressed training needs by specific producers/group of producers semi-annually.
>
> 4) Conducted /participated in minimum of targeted number of branch sponsored producer education events.
>
> 5) Conducted minimum of targeted number of key account visits/conference calls per quarter (10 visits during second half of the year).
>
> 6) Worked 90 -120 days in advance on difficult renewals; discussed with branch manager, executive underwriter or other key stakeholders on timely basis.

7) Well prepared for insured meetings including demonstrated knowledge of risk, industry, Chubb products and capabilities. Prepared with questions to guide insured meeting.

8) Renewed Key accounts (95%).

(*Id.*)

### 5.    Underwriting Quality and Compliance (10%).

This category was described as: "[a]dhere to appropriate underwriting compliance and file documentation standards and workflows to support the achievement of Branch/CC I revenue and profit goals."  (*Id.*)  The metrics for this goal were:

Compliance: - Adhered to Market conduct regulations for all business written as determined by Market Conduct Score with passing audit score, as determined by individual state standards, as performed by either the QA Compliance Audit team or Field Quality Team. - Achieved Underwriting Self-Audit and Internal Scores of 80% or higher - State regulation/guidelines adhered to as evidences by QARC feedback, Market Conduct Exams, Home Office reports and customer feedback solicited quarterly. - Demonstrated substantial improvement to state compliance standards for policies domiciled in state of Washington[.] Quality: Achieved Branch authority violations of 5% or less - Where applicable, upon periodic Customer Sensitive Level 1 checks administered by the Field Quality Team, achieve an 85% Policy Accuracy score. - Maintained appropriate file documentation as evidenced by accuracy achieved on account related documents and correspondence as measured by random audits and customer feedback solicited quarterly, or more, frequently based upon identified issues. – Demonstrated knowledge and understanding of laws, regulations and internal practices effecting insurance practice.

(*Id.*)

### 6.    Account management (7%).

Competency for this goal was described as "[s]ustains and grows existing client accounts by identifying and meeting client needs."  (*Id.*)  The behaviors were described as:

Demonstrates thorough knowledge of the insureds business environment; Creates effective visitation and communication strategies to maintain visibility in key accounts and ensure all deliverables are met; Creates strong relationships with all key account customers; Maintains account in the face of changes in the client's business environment; Establishes creative strategies that address client needs and maximize account growth including offering new coverages or increased limit options; Effectively collaborates with Home Office/Field Executive Underwriters, suggesting recommendations and making the business case to expand coverage of client needs;

(*Id.*)

United States District Court
Northern District of California

1

**7.      Insurance Legal and Regulatory Environment (6%)**

Competency for this goal was described as "[d]emonstrates knowledge and understanding

of laws, regulations, and internal practices effecting insurance practices." (*Id.*)  The behaviors for

this goal were described as:

> Has knowledge of all major legal and regulatory issues relevant to a
> product line or territory; Makes recommendations in the development
> and implementation of policies and practices to improve regulatory
> compliance; Monitors adherence to specific aspects of legislation;
> Provides learning opportunities and mentoring of others on
> compliance and quality results; Independently handles unusual
> situations or conditions with potential regulatory implications;
> Incorporates knowledge of regulatory environment into underwriting
> decisions; Demonstrates leadership and influence among staff and
> producers in communicating Chubb's appetite and compliance
> standards

(*Id.*)

**8.      Manages Sales Opportunities (7%).**

Competency for this goal was described as "[e]ffectively manages sales activities required

to advance the sale of Chubb products or services." (*Id.*)  The behaviors for this goal were

described as:

> Designs and presents sales opportunities in a manner that sways
> reluctant audiences; Creates formal proposals that effectively position
> Chubb against the competition and address clients' strategic needs;
> Moves sales opportunities forward, outlining for producers specific
> areas requiring more analysis; Convinces reluctant agents or
> prospects to commit to a decision; Immediately addresses unexpected
> problems or challenges in the delivery process.

(*Id.*)

**C.      Plaintiff's Authority, Discretion and Guidelines.**

As the underwriter, Plaintiff determined the policy's terms (but at the broker's direction)

and made the "ultimate decision in terms of what kinds of . . . sub-endorsements and policies [to]

put together for a particular client." (Dkt. No. 112-1, Ex. A (Deposition of Sybil Baffoe) at 177:9-

14.)  He could enhance coverage by providing additional endorsements on the policy.  (Dkt. No.

112-1, Ex. A at 177:15-19).  Plaintiff also could restrict coverage in certain areas if he felt there

was a risk that was not controlled.  (Dkt. No. 112-1, Ex. A at 177:20-178:1.)  Plaintiff, as the

underwriter, also had responsibility for the ultimate pricing of the insurance policies.  (Dkt. No.

United States District Court
Northern District of California

United States District Court
Northern District of California

112-1, Ex. A at 178:2-7.)  Within his underwriting authority, Plaintiff had "a lot of pricing and policy issuance flexibility and coverage enhancements or coverage reductions. . . . [I]t's based on the underwriter's judgment to determine what they want to put together for the client."  (Dkt. No. 112-1, Ex. A at 187:3-10; *see also* Dkt. No. 92-5, Ex. R (Deposition of Susan Christians) at 46:20-22 ("We have a lot of flexibility within our filed rates to determine how we want to price something based on our opinion of the risk."), 59:6-16; Dkt. No. 92-5, Ex. U (Deposition of Jennifer Newsom) at 88-11-25.)  If the scope and type of coverage fell within his authority, "he could underwrite the whole thing from beginning to end and bind coverage and have the policy issued."  (Dkt. No. 112-1, Ex. A at 74:14-16.)

Underwriters often accompanied risk engineers when they were preparing their surveys for their loss control reports, to educate themselves about the insured's operations.  Underwriters could not change the risk control recommendations in the reports, but they could work with the product line managers and sometimes write the risk engineers to conclude that a particular recommendation was not necessary or superfluous.  (Dkt. No. 110-1, Ex. A. at 170:1-171:3, 171:24.)

**1.      Plaintiff's Underwriting Authority Statement.**

██████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████ (Dkt. No. 71-6 (Declaration of Beth Holtzman), Ex. 5 (Underwriting Authority Statement).) ████████████████████████████
████████████ (*Id.*) ███████████████████████████████
██████████████████████████████ (*Id.*) ███████████████
████████████████████████████████████████████
████████████████████ (*Id.*) ██
███████████████████████████████████████████████
████████████████████████████████ (*Id.*)  In addition to the authority limits in his Underwriting Authority Statement, there were certain classes and sectors of businesses which Plaintiff was prohibited from offering.  (Dkt. No. 88-8, ¶ 8.)  Plaintiff believes

that most of the business he declined was a result of Chubb's decision not to quote insurance policies for that particular industry.  (*Id.*)  Plaintiff testified that he "consistently refer[ed] back to [his] underwriting authority statement, to make sure that [he was] in compliance with regards to Chubb's underwriting appetite and referral practices."  (Dkt. No. 89-1, Ex. 1 at 211:3-6).)

Plaintiff was required to get approval to offer more than his authorized limits.  (Dkt. No. 88-6, Ex. 3 (Deposition of Jennifer Newsom) at 144:4-18; *see also* Dkt. No. 71-6, Ex. 5.)  There are guidelines in the underwriting manuals that guide underwriters in making a referral for additional authority, how to analyze the risk, and what to recommend.  (Dkt. No. 110-1, Ex. C (Deposition of Mark Kurland) at 16:21-17:2.)  Plaintiff included his thoughts and opinions in his referral request.  (Dkt. No. 76-8, Ex. A. (Deposition of Mark Sandbergen) at 172:9-13.)  In his self-review, Plaintiff described his referrals as "very thorough, well thought out, with objectives [and] strategies clearly defined."  (Dkt. No. 76-8, Ex. J.)  If an underwriter exceeded his or her underwriting authority and if that action was caught in an audit, then there could be some disciplinary action.  (Dkt. No. 110-1, Ex. C at 23:17-24.)  Veronica Somarriba, the North American practice leader for the technology segment for Chubb's Commercial middle market division, was not aware of anyone whose employment was terminated because of exceeding authority, but she "suppose[d] it could happen."  (Dkt. No. 110-1, Ex. D (Deposition of Veronica Somarriba) at 6:6-9, 45:9-25 ("I suppose that could happen.  It just depends on . . . the circumstances, what happened, the consequences, it is an oversight, is it something . . . deliberate, . . . what actually happened.").

Plaintiff had some large, complex accounts which were beyond the underwriting authority of his supervisor, and so he was required to obtain approval from someone superior in rank to his supervisor – called a "referral."  (Dkt. No. 110-1, Ex. A at 89:22-90:2).)  Plaintiff had more referrals for approval than the average underwriter because one of the largest brokers was assigned to him, and "they write a lot of complex and more cutting-edge type technology risk."  (Dkt. No. 110-1, Ex. A at 91:22-92:6).)  Mark Kurland, Chubb Senior Vice President, Executive Field Underwriter, estimated that Plaintiff referred anywhere between five and fifty accounts in Plaintiff's last year of working with him.  (Dkt. No. 110-1, Ex. C at 53:19-25).)  Some complex

accounts required multiple referrals before Plaintiff could provide an insurance quote.  (Dkt. No. 89-1, Ex. 1 at 129:4-130:15).)  According to the list of accounts produced by Chubb, Plaintiff worked on 67 accounts with Chubb policies during his over three years of working there as an underwriter.  (Dkt. No. 110-1, Ex. E.)

> **2.    Strategies and Guidelines.**

Chubb has internal pricing strategies which underwriters had to follow.  (Dkt. No. 88-8, ¶ 11.)  Underwriters such as Plaintiff did not draft these strategies.  (Dkt. No. 110-1, Ex. A at 58:9-16; Ex. C at 38:12-15.)  Plaintiff did not make the decisions about whether Chubb would provide certain types of insurance coverage or in which industries to work.  (Dkt. No. 88-8, ¶ 9.)

Plaintiff states that an underwriting manager, to whom he reported, closely monitored Plaintiff.  (Dkt. No. 88-8, ¶ 3.)  When Plaintiff made assessments regarding whether to offer coverage to an insured, his decisions were based on Chubb's pricing, strategies, and guidelines.  (Dkt. No. 88-8, ¶ 9.)  He was required to follow Chubb's corporate underwriting strategies and guidelines, including pricing guidelines.  (*Id.*; *see also id.*, ¶ 4 (his underwriting decisions were "cabined by Chubb's many pricing and underwriting strategies and guidelines")).)

Plaintiff had "a lot of discretion, but it [was] not unlimited."  (Dkt. No. 88-6, Ex. 3 at 145:14-19.)  As stated in his Underwriting Authority Statement: ███████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████ (Dkt. No. 71-6, Ex. 5.) Chubb has "a number of different underwriting strategies and guidelines based on industry practice, based on coverage, based on emerging legal issues, based on technology."  (Dkt. No. 88-6, Ex. 3 at 145:6-9.)  Chubb's 30(b)(6) witness explained the strategies and guidelines as follows: "Strategies tend to . . . prescribe exclusions or suggest limits, whereas guidelines or white papers educate."  (Dkt. No. 88-6, Ex. 3 at 253:1-6.)  Plaintiff used the term "strategy" to mean a document from which he could determine Chubb's overall limit, as opposed to his personal limit, so he could determine whether he could seek approval through a referral.  (Dkt. No. 89-1, Ex. 1 at 104:9-105:3.)

The underwriting guidelines provide standards to ensure that underwriters use a process that is consistent, thorough, and meets the standards of care.  (Dkt. No. 110-1, Ex. D at 23:2-9.) Somarriba explained:

> An underwriter would need to – these are very specific standards or parameters that we use for technology.   There are more general standards that you use for, basic lines of business, such as property or liability.   So an underwriter would have to be familiar with both.

(Dkt. No. 110-1, Ex. D at 25:14-19.)  Chubb constantly sent underwriters information about its corporate guidelines, the divisional guidelines, the line of business guidelines, and the industry issues.  (Dkt. No. 110-1, Ex. D at 51:3-17.)  Every underwriter reviewed this information so they were able to apply it to each of the accounts they were working on.  (*Id.* at 17-21.)

Executives more senior than Plaintiff provided underwriters such as Plaintiff with parameters, which act as "a filter through which underwriters take an account and analyze [*sic*] all the basic exposures."  (Dkt. No. 110-1, Ex. D at 22:5-12.)  Chubb broke down the underwriting tasks into detailed, prescribed, standardized steps.  (Dkt. No. 88-8, ¶ 3.)  As an example, Plaintiff points to the Chubb Worldwide Commercial Property Underwriting Manual.  (Dkt. No. 89-1, Ex. 1 at 105:10-12.)  The manual includes an "Underwriter's Checklist," which provides:



(Dkt. No. 89-1, Ex. 1 at 108:11-109:1.)  Plaintiff testified that he referred to this document "a little bit" and that it was "more for folks that don't have as much experience underwriting accounts." (Dkt. No. 89-1, Ex. 1 at 105:13-20.)  The manual describes what underwriters would do as part of their process, but Plaintiff was not required to refer to the manual to know what to do.  (Dkt. No. 89-1, Ex. 1 at 106:3-7.)  The manual provided more of an overview on how to think about risk and hazards.  (Dkt. No. 89-1, Ex. 1 at 106:18-24.)

1

2

3

4

5                                        (Dkt. No. 88-8, ¶ 39 (quoting Ex.

6  A to Declaration).)  Plaintiff was required to prepare a risk report, in which he outlined his

7  underwriting thought process, discuss the insured's operations, the overall loss history, the values,

8  and the coverage intent.  (Dkt. No. 89-1, Ex. 1 at 154:2-11.)  As Somarriba explained:

> So if I'm a line underwriter, the first thing I do especially in
> technology is try to figure out what does the insured do.  Because
> oftentimes websites and marketing materials from the company are
> giving you, you know, information that is designed to sell their
> products.  So what we need to do is figure out what they do,
> understand what the product does, what the processes are through
> which they make those products, and then make an assessment of the
> company, the risk management practices, the financial strength.  And
> then we ask underwriters to provide their best opinion or estimate of
> the hazard of those exposures and provide their opinion as to what
> they want to do with the account.

15  (Dkt. No. 110-1, Ex. D at 22:12-23:1.)

16        Chubb performed audits of its underwriters.  (Dkt. No. 110-1, Ex. C at 20:5.)  Plaintiff

17  declared that Chubb regularly audited underwriters' work to ensure that they were adhering

18  strictly to their limits of authority, following Chubb's strategies and guidelines, and properly

19  documenting every step of their work.  (Dkt. No. 88-8, ¶ 28.)  However, Plaintiff was unaware of

20  whether his work was ever reviewed in an audit.  (Dkt. No. 100 at 211:8-12.)

21        As summarized by his supervisor, Plaintiff had to operate within his underwriting authority

22  and use corporate mandates as a guiding principle, but he still had "a lot of pricing and policy

23  issuance flexibility and coverage enhancements or coverage reductions."  (Dkt. No. 112-1, Ex. A

24  at 186:2-25, 187:3-14.)  Plaintiff's supervisor further explained that "the underwriter's role

25  encompasses the marketing, the analysis, the judgment that goes along with determining whether a

26  risk is suitable to write, to renew, under what terms and conditions that they want to issue a policy.

27  . ."  (*Id*. at 19:19-23.)  Plaintiff's supervisor retained the ability to provide or revoke Plaintiff's

28  underwriting authority.  (*Id*. at 87:23-88:12, 90:3-5.)

United States District Court
Northern District of California

### 3.     Other Guidance and Tools.

The processing center, based on the information provided to it, provided the initial rating and premiums that underwriters then refined.  (Dkt. No. 110-1, Ex. A. at 188:7-16.)  Plaintiff states that, although he could make adjustments, he had limits to what and how much he could alter the premiums.  (Dkt. No. 88-8, ¶¶ 22-24, 35.)  Chubb provided underwriters with electronic tools to help them choose what level of coverage to offer for an individual account.  (Dkt. No. 110-1, Ex. D at 54: 13-20.)  "[I]t gives them an electronic version of a decision tree."  (*Id*. at 54:19-20.)  The electronic tool changed the type of debits or credits provided, based on the information provided by the insured or prospective insured and assessed by the underwriter.  Then underwriters decided, based on their assessments of the accounts, what debits and credits to use to modify the overall premiums.  (*Id*. at 56:5-15.)  Chubb has filed rates with the state of California, and the state of California allows for a maximum schedule credit or debit of twenty-five percent.  (Dkt. No. 76-8, Ex. A at 122:5-22.)  "Based on the underwriter's discretion and the risk characteristics, you could debit or credit the property portion of the account."  (Dkt. No. 76-8, Ex. A at 123:11-18.)  Plaintiff considered factors such as management expertise, location issues, the quality of training of employees, and adherence to safety.  (Dkt. No. 76-8, Ex. A at 123:1-3.)  ██ ███████████████████████████████████████████████████████████████ ███████████████████████████  (Dkt. No. 76-8, Ex. B (Deposition of Jennifer Newsom) at 256: 21-257:19; Dkt. No. 88-8, ¶ 24.)  █████████████████████████████ ████████████████████████  (*Id*.)

The processing center reviewed the policy before it was sent to the customer because the processing center was responsible for ensuring that the "policy goes out correctly."  (Dkt. No. 110-1, Ex. A. at 78:10-24.)  Additionally, Plaintiff's supervisor was responsible for making sure that the underwriters she managed offered pricing that was in accordance with Chubb's expectations.  (Dkt. No. 110-1 (Ex. A. at 163:14-20.)

Chubb provided several other tools to assist underwriters like Plaintiff in determining the risk for a given account.  (Dkt. No. 110, Ex. D at 56:18-57:3 ("There are different tools that help you determine an excess risk exposure, . . . we call this . . . decision support tools"), 58:2-7.)  If

1    the insured was seeking to renew its coverage, Plaintiff used Chubb's Loss Run Report, which

2    would show if the insured had made any claims under its policy and how much had been paid

3    under its policy.  (Dkt. No. 88-8, ¶ 17.)

### ANALYSIS

**A.    Applicable Legal Standard on Motion for Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of

factually unsupported claims.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).  Summary

judgment is proper "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In considering

a motion for summary judgment, the court may not weigh the evidence or make credibility

determinations, and is required to draw all inferences in a light most favorable to the non-moving

party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those

portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue

of material fact.  *Celotex*, 477 U.S. at 323.  An issue of fact is "genuine" only if there is sufficient

evidence for a reasonable fact finder to find for the non-moving party.  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if it may affect the outcome of the case.

*Id.* at 248.  If the party moving for summary judgment does not have the ultimate burden of

persuasion at trial, that party must produce evidence which either negates an essential element of

the non-moving party's claims or that party must show that the non-moving party does not have

enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  *Nissan

Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go

beyond the pleadings and, by its own evidence, set forth specific facts showing that there is a

genuine issue for trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir.

2000).  In order to make this showing, the non-moving party must "identify with reasonable

particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275,

1279 (9th Cir. 1996).  In addition, the party seeking to establish a genuine issue of material fact

United States District Court
Northern District of California

must take care to adequately point a court to the evidence precluding summary judgment because a court is "not required to comb the record to find some reason to deny a motion for summary judgment."  *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation omitted).  If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

**B.**     **Motions to Seal.**

      The Court GRANTS the motions to seal as follows:

1)     Exhibits 5, 7, and 9 to the Declaration of Beth Holtzman in support of Plaintiff's motion for conditional certification in their entirety (Dkt. No. 71-6); Exhibit 6 to the Holtzman Declaration only to the extent Defendant sought to seal portions of this document as attached as Exhibit J to the declaration of Suzannah K. Howard in support of Chubb' motion for summary judgment (Dkt. No. 76-8);

2)     Chubb's motion for summary judgment at lines 8-10 and 14-15 on page 8 (Dkt. No. 76-7);

3)     Chubb's opposition to Plaintiff's motion for conditional certification at lines 10-11 and 17-21 on page 9 (Dkt. No. 76-9);

4)     The requested portions of Exhibits G, H, I, R, and S to the Howard Declaration in support of Chubb's opposition to the motion for conditional certification (Dkt. No. 76-10);

5)     The requested portions of Exhibits F, G, H, J, and M to the Howard Declaration in support of Chubb's motion for summary judgment (Dkt. No. 76-8);

6)     Plaintiff's reply in support of his motion for conditional certification at lines 5-13 on page 13 (Dkt. No. 80-4)

7)     Exhibit 7 to the Holtzman Declaration in support of Plaintiff's reply for the motion for conditional certification (Dkt. No. 80-6);

8)     Exhibits 4, 6 to the Laura L. Ho Declaration in support of Plaintiff's opposition to Chubb's motion for summary judgment (Dkt. No. 88-6; Exhibit 5 to the Ho Declaration only to the extent Chubb sought to seal portions of this document as

United States District Court
Northern District of California

attached as Exhibit J to the Howard Declaration in support of Chubb's motion for summary judgment (Dkt. No. 76-8);

9)   Chubb's first reply in support of their motion for summary judgment as to the requested portions on pages 4, 6, 7 and 10 (Dkt. No. 92-6);

10)   Chubb's opposition to Plaintiff's motion to continue as to the requested portions on page 6, lines 22-24 on page 7, lines 16-26 on page 8 (Dkt. No. 92-7);

11)   The requested portions of Exhibits to the Howard Declaration in support of Chubb's opposition to Plaintiff's motion to continue (Dkt. No. 92-8);

12)   The requested portions of Plaintiff's reply in support of his motion to continue (Dkt. No. 95-4);

13)   The requested portions of the Mark Sandbergen Declaration in support of his motion to continue for summary judgment (Dkt. No. 95-8);

14)   Exhibits 4 and 5 to the to the Ho Declaration in support of Plaintiff's motion to continue (Dkt. No. 95-6);

15)   The requested portions of Chubb's revised reply in support of their motion for summary judgment (Dkt. No. 111-4); and

16)   The requested portions of Chubb's revised amended reply in support of their motion for summary judgment (Dkt. No. 121-4).

The Court previously granted a request to seal as to Exhibits A and B to the Declaration of Mark Sandbergen, but denied the request as to the motion as to paragraphs 39 and 40 in the Sandbergen Declaration (Dkt. Nos. 88-8, 88-9.)  The Court DENIES the motions as to the remainder of the parties' requests.  The Court also DENIES Plaintiff's motion to seal Docket Number 88-4 because the Court previously struck that document in full.

**C.     Chubb's Evidentiary Objections to Underwriters Declarations.**

Chubb objects to the declarations Plaintiff submitted from other underwriters because they are irrelevant in evaluating Plaintiff's role.  Plaintiff was a senior underwriter.  Only two other senior underwriters submitted declarations; the other declarations were from underwriters who were not senior underwriters.  (Dkt. No. 72-2.)  Melissa Morris worked for the Professional

16

Liability division, worked primarily with directors' and officers' insurance, and was supervised by Robert Molitoris.  (Dkt. No. 72-2, Ex. 7.)  Rickey Watson was a senior underwriter in the agribusiness underwriting department and was supervised by Mark Funk.  (Dkt. No. 72-2, Ex. 10.)  Thus, the only two underwriter with the same job title as Plaintiff worked in different departments, worked on different types of insurance policies, and were supervised by different people.

Additionally, Morris and Molitoris do not include any information about the scope of their responsibilities and discretion, such as their authorization limits or goals for securing new policy premiums, and thus their declarations to not provide any relevant comparisons to Plaintiff.  Therefore, the Court finds that these declarations are not relevant to Plaintiff's job experience and circumstances.

Moreover, even if the Court were to consider their declarations, they would not be helpful to establish the issue of whether Plaintiff exercised discretion and independent judgment, because Morris and Molitoris address issues that are already undisputed.  For example, both Morris and Molitoris declare that they used "CSI Express" to generate premiums.  (Dkt. 72-2, Ex. 5 at ¶ 8, Ex. 7 at ¶ 8.)  As discussed below, it is undisputed that Plaintiff similarly used software to generate premiums.  Similarly, both Morris and Molitoris state that they followed guidelines and that they could only issue a policy quote if it was within their authority limit.  (Dkt. 72-2, Ex. 5 at ¶ 7, Ex. 7 at ¶ 7.)  Again, it is undisputed that Plaintiff followed guidelines and had an authority limit.[2]

Finally, their statement that "the job of underwriting at Chubb does not permit the exercise of discretion and independent judgment" is a legal conclusion.  (*Id*.)

Thus, the Court considers the declarations submitted by other underwriters to be irrelevant under Fed.R.Evid. 602.

**D.    Chubb's Motion for Summary Judgment.**

Chubb moves for summary judgment on Plaintiff's claim under the Fair Labor Standards Act ("FLSA") on the grounds that Plaintiff was exempt from the requirements of overtime pay as

_____

[2] And in one area, their declarations fail to address an issue that Plaintiff does address, as neither Morris nor Molitoris addresses whether they used credits and debits to affect the premiums.  (Dkt. 72-2, Ex. 5 at ¶ 8, Ex. 7 at ¶ 8.)

United States District Court
Northern District of California

1    a "highly compensated employee" ("HCE").  The FLSA requires employers to pay employees

2    overtime wages for working more than 40 hours in a week.  29 U.S.C. § 207(a).  Certain

3    employees who are employed in an administrative or professional capacity are exempt from this

4    requirement and thus are classified as "exempt" employees.  29 U.S.C. § 213(a)(1).  This

5    exemption is commonly known as the "administrative exemption."  Highly compensated

6    employees who regularly and customarily perform the duties of employees under the

7    administrative exemption are also exempt.  29 C.F.R. § 541.601.

8         The issue in this case is whether Chubb properly classified Plaintiff, a senior underwriter,

9    as exempt from the requirements of overtime pay under the HCE exemption.  Chubb, the

10   employer, bears the burden of proving an employee is exempt as an affirmative defense. *Deluca v.*

11   *Farmers Ins. Exch.*, 386 F. Supp. 3d 1235, 1251 (N.D. Cal. 2019) (citing *Klem v. Cnty. of Santa*

12   *Clara, Calif.*, 208 F.3d 1085, 1089 (9th Cir. 2000)).  "The nature of the employees' duties is

13   question of fact, and the application of the FLSA to those duties is a question of law." *Ballaris v.*

14   *Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004).  FLSA's exemptions must be given a

15   "fair reading" rather than being construed narrowly against the employer. *Encino Motorcars v.*

16   *Navarro*, — U.S. —, 138 S.Ct. 1134, 1142 (2018).

17        To show that Plaintiff is exempt as a HCE, Chubb must demonstrate that (1) Plaintiff's

18   "primary duty included performing office or non-manual work"; (2) Plaintiff received total annual

19   compensation of at least $100,000; and (3) Plaintiff "customarily and regularly perform[d] any one

20   or more of the exempt duties or responsibilities of an . . . administrative . . . employee."  29 C.F.R.

21   § 541.601.[3]  The regulations define the duties of an administrative employee as: (1) "office or non-

22   manual work directly related to the management or general business operations of the employer or

23   the employer's customers" and (2) "the exercise of discretion and independent judgment with

24   respect to matters of significance."  29 C.F.R. § 541.200.

25        Plaintiff argues, in reliance on *Carson v. City of Los Angeles*, 2016 WL 7647681 (C.D.

26   Cal. Sept. 22, 2016), that the HCE exemption requires Chubb to prove that Plaintiff's "primary

27

28        _____

          [3] This is the version of the regulation in effect at the time Plaintiff worked for Chubb.

duty" was both to perform office or non-manual work and to conduct exempt work as defined by the administrative employee exemption.  Plaintiff's argument is contrary to the regulation for the HCE exemption.  The plain text of the regulation shows that the word "primary" only refers to the requirement of office or non-manual work.  Chubb must demonstrate that Plaintiff's "primary duty" included performing office or non-manual work – not also that his primary duty was to perform work under the administrative employee exemption.  It is undisputed that Plaintiff's primary duty was to perform office or non-manual work.  Next, Chubb must show that Plaintiff "customarily and regularly" performed one or more of the exempt duties or responsibilities of an administrative employee.  29 C.F.R. §§ 541.601(a), (c).  Chubb need not show that Plaintiff's "primary duty" involved "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" or "the exercise of discretion and independent judgment with respect to matters of significance" as required by the administrative employee exemption.  *Compare* 29 C.F.R. §§ 541.200(a)(2), (3) *with* 29 C.F.R. §§ 541.601(a), (c).  Under Plaintiff's interpretation, the HCE exemption would be identical to the administrative employee exemption.  The HCE exemption is clearly designed to be different from the administrative employee exemption.

There is no dispute that Plaintiff's primary duty includes performing office or non-manual work and that he received total annual compensation of at least $100,000 for the three years preceding the filing of this action.  Therefore, the Court turns to the third prong – whether Plaintiff customarily and regularly performed "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" or "the exercise of discretion and independent judgment with respect to matters of significance."  The regulations define the phrase "customarily and regularly" to mean:

> a frequency that must be greater than occasional but which, of course, may be less than constant.  Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

*Id.* § 541.701; *see also* Opinion Letter Fair Labor Standards Act (FLSA), 2019 WL 2914104, at *1 ("To satisfy the third prong, the employee need only perform one or more exempt duties more

United States District Court
Northern District of California

than occasionally) (citing 29 C.F.R. § 541.701).  Moreover, the "highly compensated employee" regulation explains that "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties.  Thus, a highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an . . . administrative . . . employee . . . ."  29 C.F.R. § 541.601(c); *see also* Opinion Letter Fair Labor Standards Act (FLSA), 2019 WL 2914104, at *2 ("Because "[a] high level of compensation is a strong indicator of an employee's exempt status," the highly compensated employee exemption "eliminate [s] the need for a detailed analysis of the employee's job duties.") (citing 29 C.F.R. § 541.601(c)).

Many courts have found that the HCE exemption applies when the employee meets either the second or third prong of the administrative exemption.  *See*, *e.g.*, *Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273, 1303-04 (C.D. Cal. 2015) ("At least one regularly performed duty or task must fall squarely within . . . one of the 'duties' prong of the administrative exemption.").  However, these courts were applying the exceptions narrowly, as opposed to under a "fair reading" as now required by *Encino*.  *Smith v. Ochsner Health Sys.*, 353 F. Supp. 3d 483, 497-98 (E.D. La. 2018).  As the court in *Smith* reasoned:

> A "fair reading" of the phrase "any one or more of the exempt duties or responsibilities . . . of an administrative employee," though, cannot mean that the employer must prove one of the administrative exemption elements as they are analyzed for purposes of that exemption.  If that were so, the highly compensated employee regulation would have explicitly referred to the elements, not the "duties or responsibilities," of the administrative employee.  Instead, a "fair reading" of the phrase "any one or more of the exempt duties or responsibilities of . . . an administrative employee" would encompass work in the functional areas listed in 29 C.F.R. § 541.201(b), including "quality control; purchasing; procurement; . . . legal and regulatory compliance; and similar activities.

*Smith*, 353 F. Supp. 3d at 498.

### 1. Whether Plaintiff Customarily and Regularly Exercised Discretion and Independent Judgment with Respect to Matters of Significance.

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the

various possibilities have been considered." 29 C.F.R. § 541.202(a). A court must consider several factors when determining whether an employee exercises discretion and independent judgment, including "whether the employee has authority to negotiate and bind the company on significant matters. . . ." 29 C.F.R. § 541.202(b). Exercising discretion and independent judgment "implies that the employee has authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c). Having "'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." *Id*. Additionally, an employee may exercise discretion and independent judgment even if his or her decision is subject to review and on occasion the decisions are revised or reversed. *Id*. The exercise of discretion and independent judgment "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e).

### i.      Other Cases Examining Underwriters.

Several district courts have examined whether insurance underwriters exercised discretion and independent judgment, albeit under the stricter standards of requiring that the exercise discretion and independent judgment was a primary duty under the administrative, as opposed to the HCE exemption, and under the "narrow reading" of FLSA exemptions most circuits applied before *Encino*. Nevertheless, the Court finds their analyses helpful.

In *Maddox v. Continental Cas. Co*., the plaintiff was a senior underwriter for an insurance company. 2011 WL 6825483, *1 (C.D. Cal. Dec. 22, 2011). In that position the plaintiff gathered various types of information from brokers, insurance applications, information regarding losses, information about the nature of the client's business, and reports prepared by his company's risk control department. The plaintiff was required to "independently determine whether the risk was acceptable to [his company], and if so, how to price that risk to hopefully ensure that [his company] made a profit." *Id*. The plaintiff's company provided him with tools to assist in making underwriting decisions, including the risk support tool, which was "a predictive model which provide[d] a recommended price range at which, theoretically, [the company] should be able to make a profit on the insurance." *Id*. The underwriter in *Maddox*, utilized this computer rating tool

21

and also analyzed and considered a variety of other factors. *Id.*

Before the plaintiff in *Maddox* was disciplined, he had authority to bind the company to insurance contracts within the scope of his authority. *Id.*, 2011 WL 6825483 at *2. "When an underwriting decision was within the scope of his authority, [the p]laintiff had exclusive discretion to evaluate risks, determine their acceptability, determine the appropriate premium to quote to the broker, and bind [the company] to the policy." *Id.* If the plaintiff wanted to pursue a matter that was outside the scope of his authority, he was required to refer the matter first to a manager or an underwriter specializing in the area at issue. *Id.* The court held that the plaintiff exercised discretion and independent judgment on matters of significance. *Id.*, 2011 WL 6825483 at *5-7. The court found that the plaintiff continued to exercise discretion and independent judgment, even when he lost the ability to independently bind the company within the scope of his authority, because he continued to assess the risk, using the same information, tools, and judgment. *Id.*, 2011 WL 6825483 at *6-7. Additionally, even though the company provided the plaintiff "with a variety resources and tools in order to assist him in the evaluation of risks, . . . none of these tools or resources were intended to be a substitute for an underwriter's judgment." *Id.*, 2011 WL 6825483 at *6.

In *Hanis v. Metro. Life Ins. Co*., the plaintiff also was a senior underwriter for an insurance company and provided underwriting services for multiple lines of coverage. 2016 WL 5660344, at *1 (W.D. Mo. Sept. 29, 2016). The plaintiff's primary responsibility was to evaluate the risk of a specific group, determine the appropriate plan design, and establish the rate. *Id.* The company's computer system determined the rate, but the plaintiff could adjust the rate by gathering additional information and adjusting the margin within certain allowed parameters. *Id.*; *see also* 2016 WL 5660344 at *11 ("Even though MetLife underwriters utilized software programs, it is obvious that they also utilized a substantial amount of discretion and independent judgment in determining how the information was input into these systems and how the information was utilized, once the computer had analyzed it."). The plaintiff had an annual premium limit of $500,000. *Id.*, 2016 WL 5660344 at *2. Similar to the plaintiff in *Maddox*, the plaintiff could provide a quote and set the pricings without any consultation with a manager or supervisor as long as it was within his

premium authority.  *Id.*  The court concluded that the plaintiff "exercised considerable discretion and independent judgment on matters of significance in reviewing and analyzing the information necessary to generate insurance quotes."  *Id.*, 2016 WL 5660344 at *12.

In *Edwards v. Audubon Insur. Group, Inc.*, the plaintiff was an underwriting specialist when his employment was terminated.  2004 WL 3119911, * 1 (S.D. Miss. Aug.31, 2004).  The court found that the plaintiff "generated premium dollars for Audubon and his independent underwriting decisions resulted in Audubon providing millions in insurance coverage, thereby exposing Audubon to millions in exposure to losses and, conversely, providing millions in insurance coverage to accounts."  *Id.*, 2004 WL 3119911 at *4.  "Underwriters decide what risks the company would take and at what price, which is clearly exempt work."  *Id.*, 2004 WL 3119911 at *5.  The court also concluded that the plaintiff's "job clearly included the exercise of discretion and independent judgment.  [The plaintiff] had autonomous underwriting authority and admitted that he made independent decisions (i.e., without supervisory approval) to quote insurance coverage."  *Id.*, 2004 WL 3119911 at *6.  The court rejected the plaintiff's assertion that he did not exercise sufficient discretion and independent judgment because he was constrained by the company's underwriting manual because the manual did not dictate "which accounts to write or not to write."  *Id.*, 2004 WL 3119911 at *7.

In *Graves v. Chubb & Sons*, the plaintiff was classified as an "Underwriter I" with up to $5 million dollars in authority.  2014 WL 1289464, *1 (D. Conn. Mar. 31, 2014).  In light of conflicting evidence, including that the plaintiff input the data into the computer program to obtain the premium, the court held that whether the plaintiff exercised discretion and independent judgment turned on disputed issues of fact.  *Id.*, 2014 WL 1289464, *2, 8.  The company produced evidence that, although the plaintiff was required to use certain underwriting tools, he retained discretion to analyze and price the risk differently.  *Id.*, 2014 WL 1289464, *8.  However, the plaintiff testified that if he wanted to diverge from the pricing for an account, he was required to seek a senior underwriter's advice or follow specific directions from the "playbook" regarding that particular situation.  *Id.*  Therefore, the court did not grant summary judgement for either side.  *Id.*

ii.     **Plaintiff's Discretion and Judgment.**

Upon a close examination of the evidence in the record, the Court finds that the undisputed duties of Plaintiff customarily and regularly involved the exercise of discretion and independent judgment. The Court views the evidence with the understanding that Plaintiff's high level of compensation is a strong indicator of his exempt status. 29 C.F.R. § 541.601(c); *see also* Opinion Letter Fair Labor Standards Act (FLSA), 2019 WL 2914104, at *2 ("Because "[a] high level of compensation is a strong indicator of an employee's exempt status," the highly compensated employee exemption "eliminate [s] the need for a detailed analysis of the employee's job duties.") (citing 29 C.F.R. § 541.601(c)).

It is undisputed that Plaintiff had an authorization limit, that Chubb provided guidelines and manuals, and that Chubb also provided tools to assist in generating the policy quotes. However, Plaintiff does not dispute that, within those guidelines and substantial amounts for authorization, he evaluated risk and had flexibility in determining the premiums. The dispute here, if any, is about the scope of Plaintiff's discretion and not whether he exercised discretion.

Plaintiff's year-end 2015 Performance Review states that he was expected to "[e]stablishe[] creative strategies that address client needs and maximize account growth including offering new coverages or increased limit options." (Dkt. No. 76-8, Ex. J.) Both Plaintiff and his manager rated Plaintiff as "clearly exceeds" as to this goal. (*Id*.) Plaintiff made the "ultimate decision" in terms of what kinds of sub-endorsements and policies to put together for a particular client. (Dkt. No. 112-1, Ex. A at 177:9-14.) Plaintiff could enhance coverage by providing more endorsements, or he could restrict coverage in certain areas if he felt there was uncontrolled risk. (*Id*. at 177:15-178:7.) Plaintiff had "a lot of pricing and policy issuance flexibility" within his underwriting authority. (*Id*. at 187:3-10 ([I]t's based on the underwriter's judgment to determine what they want to put together for the client."); *see also* Dkt. No. 92-5, Ex. R at 46:20-22.) If the scope and type of coverage fell within Plaintiff's underwriting authority, "he could underwrite the whole thing from beginning to end and bind coverage and have the policy issued." (Dkt. No. 112-1, Ex. A, at 74:14-16.)

Although Plaintiff had some additional restrictions within these broad, outside limits,

1

2 ███████████████████████ (Dkt. No. 71-6, Ex. 5.)

3       Chubb provided some guidelines, but these guidelines, strategies and manuals did not

4 dictate Plaintiff's actions.  (Dkt. No. 71-6, Ex. 5; Dkt. No. 88-8, ¶¶ 4, 9, 11, 39; Dkt. No. 88-6, Ex.

5 3 at 145:6-9, 253:1-6; Dkt. No. 89-1, Ex. 1 at 104:9-105:3, 105:10-20, 106:3-7, 106:18-24,

6 108:11-109:1, 154:2-11; Dkt. No. 110-1, Ex. A at 19:19-23; Dkt No. 110-1, Ex. D at 22:5-23:1,

7 23:2-9, 25:14-19, 51:3-21; Dkt. No. 112-1, Ex. A. at 186:2-25, 187:3-14.)

8       The processing center, based on the information provided to it, provided the initial rating

9 and premiums that the underwriter then refined.  (Dkt. No. 110-1, Ex. A. at 188:7-16.)  Although

10 there were some restrictions, it is undisputed that Plaintiff could adjust and alter the premiums.

11 (Dkt. No. 88-8, ¶¶ 22-24, 35; Dkt. No. 76-8, Ex. A at 122:5-22, 123:11-18.)  Chubb provided

12 underwriters with electronic tools to help them determine the risk and to choose what level of

13 coverage to offer for an individual account, but again, it is undisputed that Plaintiff decided, based

14 on his assessment of the account, what credits and debits to use to modify the overall premium.

15 (Dkt. No. 110-1, Ex. D at 54:13-20; 56:5-15, 56:18-57:3, 58:2-7.)  Plaintiff evaluated several

16 factors about the insured to make that assessment.  (Dkt. No. 76-8, Ex. A at 123:1-3.)

17       The Court finds that, similar to the underwriters in *Maddox*, *Hanis*, and *Edwards*, Plaintiff

18 used tools and followed guidelines, but within his substantial underwriting authority Plaintiff

19 evaluated risks, determined the appropriate premiums to quote, and bound Chubb.  *See In re*

20 *Farmers Insurance Exchange, Claims Representatives' Overtime Pay Litigation,* 481 F.3d 1119,

21 1130 (9th Cir. 2007) ("[T]he use of computer software to estimate claims does not eliminate the

22 need for discretion and judgment any more than does resort to other reference works or to the

23 opinions of appraisers and other experts."); *Edwards*, 2004 WL 3119911, at * 6 ("Even if an

24 underwriter negotiated within prescribed ranges, he still exercised sufficient discretion and

25 judgment since . . . his discretion to negotiate within the prescribed ranges was unfettered.");

26 *Maddox*, 2011 WL 6825483, at *5, 6 (use of computer program and other resources and tools did

27 not eliminate exercise of Plaintiff's discretion and judgment); *Hanis*, 2016 WL 5660344.  The

28 Court concludes that Plaintiff's undisputed duties involved the exercise of discretion and

United States District Court
Northern District of California

1  independent judgment.

2  Additionally, the Court finds that Plaintiff customarily and regularly engaged in these

3  duties.  In fact, the types of duties Plaintiff engaged in as a senior underwriter are, to a large

4  degree, undisputed.  The duties for which Plaintiff exercised his judgment described above were

5  the core of his job as a senior underwriter:  analyzing risk, deciding terms and endorsements for

6  policies, and setting rates.  The parties' dispute centers around the characterization of these duties.

7  The Court finds that Plaintiff's duties easily satisfy the standard of "customarily and regularly"

8  under the HCE exemption.  29 C.F.R. § 541.601.

9  The Court further concludes that Plaintiff exercised discretion and independent judgment

10  with respect to matters of significance.  "The term 'matters of significance' refers to the level of

11  importance or consequence of the work performed."  29 C.F.R. § 541.202(a).  Plaintiff had the

12  authority to bind Chubb on insurance policies on eight different lines of coverage, including

13  property values up to $150 million.  (Dkt. No. 71-6, Ex. 5.)  *See Lutz v. Huntington Bancshares,*

14  *Inc.*, 815 F.3d 988, 997-98 (6th Cir. 2016) (finding underwriters made decisions that significantly

15  affected the business and determined the risk the company would accept for any particular loan, up

16  to one million dollars; noting underwriters approval binds the company to the risk); *see also*

17  *Maddox*, 2011 WL 6825483, at *5 (underwriter could bind the company to policies which could

18  expose the company to significant losses).  At the hearing, Plaintiff argued that because the value

19  of each particular insurance policy was a small percentage of Chubb's entire business, Plaintiff did

20  not work on matters of significance.  Under Plaintiff's theory, it would be difficult to find that any

21  individual employee of a large company worked on matters of significance.  The Court rejects

22  Plaintiff's theory and holds that he exercised discretion and independent judgment on matters of

23  significance.

24  Because the Court finds that Plaintiff customarily and regularly exercised discretion and

25  independent judgment on matters of significance, the Court need not also address whether Plaintiff

26  customarily and regularly performed office or non-manual work directly related to the

27  management or general business operations of Chubb or Chubb's customers.  The Court finds that,

28  based on the undisputed facts, Plaintiff was exempt as a highly compensated employee, and, thus,

grants Chubb's motion for summary judgment on Plaintiff's federal claim under the FLSA.

    **2.**      **Plaintiff's State Law Claims.**

    Because the Court grants summary judgment on the sole federal claim, the Court no longer has federal question jurisdiction.  There is no dispute that the Court lacks subject matter jurisdiction over the state law claims; the sole basis for jurisdiction over the state law claims is supplemental jurisdiction.

    Pursuant to 28 U.S.C. section 1367(c)(3), a court may decline to exercise supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction.  *See* 28 U.S.C. § 1367(c)(3).  Generally, "[w]here a district court dismisses a federal claim, leaving only state claims for resolution, it should decline jurisdiction over the state claims and dismiss them without prejudice."  *Wade v. Reg'l Credit Assn.*, 87 F.3d 1098, 1101 (9th Cir. 1996); *see also Carnegie– Mellon,* 484 U.S. 343, 350 n. 7(1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.").  The Court finds that the balance of the factors weighs in favor of declining to exercise jurisdiction over Plaintiff's state-law claims and, thus, dismisses those claims without prejudice to Plaintiff refiling his state-law claims in state court.

### CONCLUSION

    For the foregoing reasons, the Court GRANTS Chubb's motion for summary judgment on Plaintiff's federal claim under the FLSA and DECLINES to exercise supplemental jurisdiction over Plaintiff's state-law claims.  The Court DENIES Plaintiff's motion for conditional certification as MOOT.  The Court will issue a separate judgment.  The Clerk shall close the file.

    **IT IS SO ORDERED**.

Dated: March 3, 2020

_____
SALLIE KIM
United States Magistrate Judge